IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SEAN "JOBY" MAISLIN | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:08-cv-0424** |
| | ) | **Judge Trauger** |
| TENNESSEE STATE UNIVERSITY, | ) | |
| and WILLIAM BAXLEY, | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by defendant

Tennessee State University (Docket No. 44), to which the plaintiff has responded (Docket No.

51), and the defendant has replied (Docket No. 52).[1]  For the reasons discussed below, the

defendant's motion will be granted.

## FACTS

The plaintiff, Sean "Joby" Maislin ("Maislin"), began taking classes at Tennessee State

University ("TSU")  in the fall of 2006.[2]  Maislin is Caucasian, and TSU is a historically

---

[1] Defendant William Baxley has not appeared in this case, and the plaintiff has a pending
Motion for Entry of Default Judgment against him (Docket No. 43).  Therefore, throughout this
opinion, "the defendant" will refer solely to TSU.  The court previously filed an Order (Docket
No. 46) stating that, in the event of summary judgment in favor of TSU, the plaintiff should file a
motion to have the default judgment motion against Baxley set for hearing.  The plaintiff is now
free to file such a motion.

[2] Unless otherwise noted, the facts are drawn from the defendant's Statement of
Undisputed Facts (Docket No. 48), the plaintiff's response thereto (Docket No. 51, Ex. 1), and

1

African-American university.  Maislin's roommate was William Baxley ("Baxley"), an African-American student.

Maislin and Baxley lived together in Hale Hall, a dormitory for students enrolled in TSU's honors program.  The two men were close friends during their first semester.  Baxley was quiet, studious, and, except for one isolated incident, not irritable.  During the second semester, however, Maislin became concerned because Baxley was acting aggressively and using derogatory language.  At one point, Baxley told Maislin, "You act like you want to be a nigger," and he called Maislin "cracker" on "a few occasions."  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts, Docket No. 51, Ex. 1 ¶ 10.)  Maislin believed that Baxley was jealous that Maislin, a white student, was making more friends at TSU than he was.  As tensions grew, Baxley began bumping Maislin's shoulder when Baxley left the room.

In February or March of 2007, Maislin spoke with Dr. Sandra Holt ("Holt"), TSU's Director of the University Honors Program.  He told her that Baxley's mood had shifted and that Baxley's behavior was becoming more aggressive.  Maislin said that Baxley treated his own girlfriend poorly, often referring to her as a "chicken head," and that he regularly used the word "nigger."  Maislin also told Claudine Greer, the director of the residence hall, that Baxley was acting "weird."

Baxley himself met with Holt around the same time to discuss his concerns about

---

related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

*Maislin's* use of the word "nigger." Holt testified that she gave Baxley "a little lesson on multiculturalism or respect as far as [inter]cultural communication's concerned." (Dep. of Sandra Holt, Docket No. 44, Ex. 9, at 42.) Holt told Baxley that he should be "careful" and "mindful" about his own use of the word, because it might signal to others that the word is not inappropriate. (*Id.* at 42-43.) Holt testified that she finds the word offensive regardless of who uses it. (*Id.* at 44.) Baxley and two other students had a second, similar meeting with Holt about Maislin's use of epithets. They complained that Maislin said that "he knew more about being black than [Baxley] did." (*Id.* at 88.) Despite their complaints, "all three students seemed to like the plaintiff." (Docket No. 51, Ex. 1 ¶ 38.)

As Baxley's aggressive behavior escalated, Maislin's father, Gerald Brian Maislin ("Brian Maislin"), met several times with Holt. In late March or early April 2007, he told Holt that he was concerned that Baxley wanted to fight his son, that Baxley's behavior had changed, and that Baxley had started "[running] with a different crowd." (Docket No. 51, Ex. 1 ¶ 39.) Holt said that she would talk to Baxley about it. She never did, however, because she felt that the crowd Baxley ran with was "not [her] business," and she had received no other complaints about Baxley. (Docket No. 44, Ex. 9, at 61.) In mid-April, after unsuccessfully trying to reach Holt by phone, Brian Maislin went to her office. He asked her to "mediate" his son's roommate situation, and she again said that she would talk to Baxley.

Brian Maislin spoke to Holt a third time on April 25, 2007, telling her that he was concerned that his son and Baxley would come to blows. By that point, the plaintiff was spending nights at his parents' house, although he continued to stay at the dorm room between

classes. Still, neither the plaintiff nor his father ever requested a roommate transfer, and the plaintiff testified that he had decided to wait until the end of the school year to make such a request. There is no evidence that in the April 25 meeting, or in either of Brian Maislin's previous meetings with Holt, the topic of race ever arose. Holt once again told him that she would talk to Baxley.

Later on April 25, several hours after his father's meeting with Holt, Maislin finished an exam and returned to the dorm room with a migraine headache. When Baxley returned and saw that Maislin was watching his television, he warned Maislin about touching his possessions. Maislin rose from the bed, and Baxley struck him with a clothes iron as many as ten times. Maislin was taken to the hospital and treated for a cut to his head and other injuries. TSU police immediately arrested Baxley, who was charged with aggravated assault.

After hearing of the incident, TSU Dean of Students Peggy Earnest ("Earnest") "gave the directive to Claudine Greer that Baxley was not to be allowed back on campus." (Docket No. 51, Ex. 1 ¶ 43.) Baxley, out of jail on bond, met with Earnest on April 26 or 27. Earnest told Baxley to pack up his dorm room and leave campus, although she allowed him to return to campus to take his final exams. Earnest also told Baxley that she was going to recommend that he be suspended. Baxley promptly moved out of the dorm and stayed with his aunt for the remainder of the school year.

The day after the incident, Brian Maislin spoke with Holt. He testified that Holt told him that the incident "may have been a good experience for his son because he now knew what it felt like to be a minority." (Docket No. 51, Ex. 1 ¶ 33.) Holt denies saying this. Plaintiff's parents

4

also met with TSU's Chief of Police, who told them that Baxley would not be allowed back on campus, aside from final exams.[3]  Despite this, the plaintiff claims that Baxley was seen on campus at least four times after the incident: Brian Maislin saw him when Baxley was on campus to help his sister, who was also a TSU student, pack up her room; Brian Maislin saw him a second time in the stairwell of Hale Hall; the plaintiff saw Baxley "hanging out" with his sister shortly after the incident; and Holt spoke once with Baxley at Hale Hall, at which time she advised him to get counseling for anger issues.

Baxley did not return to TSU in the fall of 2007; he instead transferred to the University of Memphis.  (Dep. of William Baxley, Docket No. 44, Ex. 5, at 147.)  Baxley testified that, after receiving the impression that he was suspended for one year, he called the Dean to inform her that he was "no longer interested in pursuing a degree at Tennessee State."  (*Id.* at 145-46.)  Earnest testified that she learned during the summer that Baxley was leaving TSU.  (Dep. of Peggy Earnest, Docket No. 44, Ex. 11, at 46.)  In September 2007, Earnest announced that TSU would hold a formal disciplinary hearing regarding Baxley.  The hearing ultimately took place in April 2008; neither Baxley nor Maislin attended.  Baxley testified that he skipped the hearing partly because he had the impression that he was already suspended.  (Docket No. 44, Ex. 5, at 145.)  The hearing resulted in TSU's officially suspending Baxley through May 2009 and placing certain conditions on his future re-enrollment.

In the fall of 2007, TSU Provost, Dr. Robert Hampton, met with Maislin's parents, at

---

[3] The Chief told them that posters of Baxley would be put up around campus, but to Brian Maislin's knowledge, that never happened.

their request, to discuss their son's situation. The plaintiff claims that Hampton fell asleep during this meeting and seemed indifferent to the situation. Hampton told Maislin's parents that Maislin could go to a different school if he remained concerned about security; Hampton reiterated this when Brian Maislin called him to follow up on the meeting. The parties differ as to whether this statement was motivated by racial animosity or by concern for Maislin's academic career. Brian Maislin testified that Hampton also told him that Baxley could not be barred from campus until the completion of a disciplinary hearing, which had not yet taken place.

Maislin was on scholarship during his freshman year, and he remained on scholarship the next year.[4] But by the end of his second year, his grade point average declined, and TSU revoked the scholarship because of grades.[5] Maislin claims that his poor grades resulted from anxiety and nightmares caused by fears that Baxley would return to campus. Maislin testified that he feared Baxley's return because TSU did not hold a disciplinary hearing against Baxley until April 2008.

There is no evidence, however, that Baxley ever returned to TSU's campus during Maislin's sophomore year. Maislin lived in Hale Hall again his sophomore year, and aside from the events described herein, he had no similar problems with any professor, student, or administrator at TSU. Maislin testified that he felt the only TSU official who exhibited

---

[4] Maislin's final exams for the Spring 2007 semester were delayed by the attack, but he eventually took the exams and received grades based on his performance throughout the semester.

[5] Maislin does not claim that the revocation was racially motivated or discriminatory.

"intentional racial discrimination" against him was Holt, and that the Dean and Provost were being "negligent." (Dep. of Sean Maislin, Docket No. 44, Ex. 2, at 122-124.)

## ANALYSIS

The plaintiff alleges that TSU's actions (or lack thereof) before and after Baxley's attack constitute racial discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* This is the only count against TSU contained in the First Amended Complaint (Docket No. 24). The defendant has moved for summary judgment on this claim, pursuant to Federal Rule of Civil Procedure 56.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a

7

genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Title VI Racial Discrimination Claim

Maislin asserts that TSU's deliberate indifference to the racial harassment he received from Baxley, as well as TSU's actions in response to the April 25 attack, constitute a Title VI violation. Section 601 of Title VI forbids entities receiving federal funds from discriminating

8

based on race or color. 42 U.S.C. § 2000d. A threshold issue is whether a plaintiff can sustain a Title VI claim based on a school's deliberate indifference to student-on-student harassment or to a racially hostile environment.

### A.  Availability of Deliberate Indifference Claims Under Title VI

The defendant argues that, in *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court "change[d] the legal landscape of Title VI cases," barring Title VI claims based on a defendant's deliberate indifference to racial harassment.  (Def.'s Reply, Docket No. 52, at 1.) The United States Court of Appeals for the Sixth Circuit has not issued any on-point post-*Sandoval* opinions,[6] and other circuits are split as to the continued viability of deliberate indifference claims.  Ultimately, this court is persuaded that *Sandoval*, read in conjunction with the Supreme Court's Title IX jurisprudence, does not foreclose Title VI deliberate indifference claims.

In *Sandoval*, the Supreme Court emphasized that a private right of action under Title VI exists only in cases of intentional discrimination.[7]  "[I]t is . . . beyond dispute . . . that § 601

---

[6] *Horner ex rel. Horner v. Kentucky High Sch. Athletic Ass'n*, 206 F.3d 685, 692-93 (6th Cir. 2000), decided pre-*Sandoval*, left open the possibility that the deliberate indifference test might apply to cases examining the disparate impact of a facially neutral policy.  It implied that the test is valid for harassment cases.  *Id.* at 693 ("Currently, the only clear test in the Supreme Court is that of 'deliberate indifference,' [from cases that] address deliberate indifference to sexual harassment . . . .").

[7] The *Sandoval* plaintiffs sued the Alabama Department of Public Safety over its decision to administer driver's license exams exclusively in English, claiming discrimination based on national origin.  The Department of Justice had promulgated a regulation, pursuant to § 602 of Title VI, prohibiting programs that have a disparate impact based on race or national origin.  The plaintiffs claimed that Alabama's program violated this regulation.  532 U.S. at 278-79.  The Court found that no private cause of action to enforce the DOJ regulation existed, because the DOJ regulation was broad enough to cover cases in which there was no intentional

9

prohibits only intentional discrimination. . . .  What we said in *Alexander v. Choate* is true today:

'Title VI itself directly reaches only instances of intentional discrimination.'"  532 U.S. at 280-

81 (citation omitted).  The *Sandoval* opinion does not address whether "intentional

discrimination" can consist of a defendant's deliberate indifference to harassment or to a hostile

environment.  Indeed, it makes no attempt to define what "intentional discrimination" is.

   The Supreme Court's Title IX cases, however, are illuminating.  The Supreme Court has

repeatedly noted the similarities between the language and application of Title VI and Title IX.

"Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX

with the explicit understanding that it would be interpreted as Title VI was."  *Fitzgerald v.

Barnstable Sch. Comm.*, __ U.S. __, 129 S. Ct. 788, 797 (2009) (citation omitted).  *Sandoval*

itself noted that "'Title IX . . . was patterned after Title VI of the Civil Rights Act of 1964.'"

532 U.S. at 280 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 694 (1979)); *see also

Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("[Title VI] is parallel to Title

IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs

receiving federal funds, not only in education programs.  The two statutes operate in the same

manner . . . .") (citations omitted); *Cannon*, 441 U.S. at 703 ("We have no doubt that Congress

intended to create Title IX remedies comparable to those available under Title VI . . . .").

Accordingly, "because Congress based Title IX on Title VI . . . , the Court's analysis of what

constitutes intentional sexual discrimination under Title IX directly informs our analysis of what

_____

discrimination.  "It is clear . . . that the disparate-impact regulations do not simply apply § 601 –
since they indeed forbid conduct that § 601 permits – and therefore clear that the private right of
action to enforce § 601 does not include a private right to enforce these regulations."  *Id.* at 286.

constitutes intentional racial discrimination under Title VI (and vice versa)." *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin County*, 334 F.3d 928, 934 (10th Cir. 2003); *cf. Johnson v. City of Saline*, 151 F.3d 564, 573 (6th Cir. 1998) ("Given that Title IX parallels Title VI very closely, the reasoning of [a Supreme Court case allowing compensatory damages under Title IX] extends to Title VI . . . .") (citation omitted).

It is settled that, under Title IX, a defendant's deliberate indifference to a hostile environment or to a third party's harassment can constitute intentional discrimination. In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), written four years after *Sandoval*, the Supreme Court allowed a Title IX retaliation claim. The Court surveyed its previous cases: "Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination. . . . [This] encompasses intentional sex discrimination in the form of a [defendant's] deliberate indifference to a teacher's sexual harassment of a student, or to sexual harassment of a student by another student." *Id.* at 173 (citations omitted). The Court said that its holding allowing retaliation claims was "[i]n step with *Sandoval* . . . because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Id.* at 178. Implicitly, then, the other forms of intentional discrimination mentioned in *Jackson* – including deliberate indifference – are in step with *Sandoval* as well.[8] Because of the close parallels between Title IX and Title VI, deliberate indifference claims should also be allowed under the latter. *Accord AP v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125,

---

[8] Indeed, the Sixth Circuit has continued to apply the deliberate indifference test to Title IX claims. *E.g.*, *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 445 (6th Cir. 2009).

1146 (D. Minn. 2008) ("Given the close connection between Title IX and Title VI, this Court believes that the Supreme Court would require deliberate indifference as a condition of recovering money damages under Title VI, as it did under Title IX in *Gebser*.")

In arguing that Title VI deliberate indifference claims are foreclosed, TSU relies largely on *Pryor v. National Collegiate Athletic Association*, 288 F.3d 548 (3d Cir. 2002). In *Pryor*, the plaintiffs sued the NCAA after it adopted a facially neutral rule that had the effect of reducing the number of scholarships given to African-American athletes. *Id.* at 552. Citing *Sandoval*, the Third Circuit rejected the plaintiffs' theory that the NCAA was liable for its deliberate indifference to the impact the policy would have on a minority group. *Id.* at 567-68.

Although the Supreme Court in *Gebser* had allowed deliberate indifference claims regarding teacher-on-student sexual harassment, the *Pryor* court said that such allegations – in which a school "[sits] by passively while another commit[s] an intentional Title IX violation" – do not rise to "intentional wrongdoing." *Id.* at 568.

> [S]tated another way, the school in *Gebser* faced liability under Title IX not because it did anything intentionally wrong; it just sat by and did nothing at all. And again, in *Alexander v. Sandoval*, the Supreme Court held that an entity cannot incur liability under Title VI for anything short of intentional discrimination. So, if we accepted Plaintiffs' theory here, we would also have to cast the NCAA in the role of the *Gebser* school that committed a sin of omission, not a sin of commission. In so doing, we would effectively turn *Alexander* on its head, along with its prohibition against imposing liability for anything short of purposeful discrimination.

*Id.*

This attempt to distinguish intentional discrimination from deliberate indifference is

12

unpersuasive in light of the Supreme Court's own post-*Sandoval* statement that its holding in

*Gebser* involved "intentional sex discrimination in the form of a [defendant's] deliberate

indifference" to harassment. *Jackson*, 544 U.S. at 173; *see also Davis v. Monroe County Bd. of

Ed.*, 526 U.S. 629, 641 (1999) (stating that *Gebser* allowed liability "where the [school] district

itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent"). In

addition, one circuit has rejected *Pryor*'s reasoning. *Bryant*, 334 F.3d at 933 (holding that

defendants who "make the intentional choice to sit by and do nothing" can be held liable).

  In any event, *Pryor* is distinguishable from the instant case. *Pryor* dealt with deliberate

indifference to the effects of a facially neutral policy. The Third Circuit noted that a deliberate

indifference standard might conflict with "the rule, well settled by the Supreme Court, that a

decisionmaker will not commit purposeful discrimination if it adopts a facially neutral policy 'in

spite of' its impact, not 'because of' that impact."[9] 288 F.3d at 567. This concern is not present

in the context of a defendant's response to a hostile environment or to a third party's

harassment.[10] The Tenth Circuit in *Bryant* also distinguished *Pryor* on these grounds.[11] 334

---

  [9] The Fourth Circuit has cited *Pryor*, stating that "[d]eliberate indifference to a policy's disparate impact, as opposed to the purposeful pursuit of those impacts, is not a viable theory under Title VI." *Peters v. Jenney*, 327 F.3d 307, 321 n.18 (4th Cir. 2003). On its face, this formulation does not apply to harassment or hostile environment cases.

  [10] Lower courts in the Third Circuit, however, have cited *Pryor* in dismissing Title VI claims alleging deliberate indifference to a hostile racial environment. *See, e.g.*, *Lee v. Lenape Valley Regional Bd. of Ed.*, No. 06-CV-4634 (DMC), 2009 U.S. Dist. LEXIS 26788, at *12-13 (D.N.J. Mar. 31, 2009)

  [11] The Sixth Circuit anticipated a possible divide between cases addressing facially neutral regulations and those addressing harassment. *Horner ex rel. Horner v. Kentucky High Sch. Athletic Ass'n*, 206 F.3d 685, 692-93 (6th Cir. 2000) (noting that the deliberate indifference test arose in cases of sexual harassment, which "are not readily analogous to" disparate impact

F.3d at 931-32.

It is clear that the Supreme Court considers deliberate indifference to be a form of intentional discrimination under Title IX. *Sandoval* did nothing to change this. Given the parallels in the text and interpretation of Title IX and Title VI, the court finds that claims of deliberate indifference to student-on-student harassment or to a hostile environment are actionable under Title VI.[12]

### B. Deliberate Indifference Standard

In analyzing Title VI deliberate indifference claims, courts have adapted the test initially laid out by the Supreme Court in *Davis v. Monroe County Board of Education*. *See, e.g.*, *Cleveland v. Blount County Sch. Dist. 00050*, No. 3:05-CV-380, 2008 U.S. Dist. LEXIS 6011, at *28-29 (E.D. Tenn. Jan. 28, 2008); *Bryant*, 334 F.3d at 934.

---

challenges to facially neutral policies); *see also Almendares v. Palmer*, 284 F. Supp. 2d 799, 807 n.5 (N.D. Ohio 2003) (stating that the deliberate indifference test "has only been used in either racial or sexual harassment or hostile environment claims, and it does not seem directly transferable to other contexts.").

[12] It is worth noting that the District Court for the Eastern District of Tennessee recently allowed a Title VI deliberate indifference claim to survive summary judgment. *Cleveland v. Blount County Sch. Dist. 00050*, No. 3:05-CV-380, 2008 U.S. Dist. LEXIS 6011, at *28-32 (E.D. Tenn. Jan. 28, 2008). That opinion did not address TSU's *Sandoval* argument. Similarly, district courts in other circuits have also assumed the continued viability of Title VI deliberate indifference claims. *See, e.g.*, *Rodriguez v. N.Y. Univ.*, No. 05 Civ. 7374 (JSR)(JCF), 2006 U.S. Dist. LEXIS 97732, at *18 (S.D.N.Y. Nov. 17, 2006); *Watson v. Jones County Sch. Dist.*, No. 2:07cv-100-KS-MTP, 2008 U.S. Dist. LEXIS 69008, at *34 (S.D. Miss. Sept. 11, 2008); *Johnson v. Louisiana*, No. 01-2002 Section E/5, 2006 U.S. Dist. LEXIS 62093, at *10 (E.D. La. Aug. 30, 2006); *Everybody Counts, Inc. v. N. Ind. Reg'l, Planning Comm'n*, No. 2:98 CV 97, 2006 U.S. Dist. LEXIS 39607, at *47-48 (N.D. Ind. Mar. 30, 2006); *Malone v. Des Moines Area Cmty. College*, No. 4:04-cv-40103, 2005 U.S. Dist. LEXIS 1175, at *38-39 (S.D. Iowa Jan. 26, 2005). *Compare Langadinos v. Appalachian Sch. of Law*, No. 1:05CV00039, 2005 U.S. Dist. LEXIS 20958, at *31 (W.D. Va. Sept. 25, 2005) (citing *Pryor* and requiring that "discriminatory animus" motivate a defendant's inaction).

14

To sustain a student-on-student harassment claim against a school, the plaintiff must demonstrate the following elements: (1) the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school; (2) the defendant had actual knowledge of the harassment; and (3) the defendant was deliberately indifferent to the harassment. *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 258-59 (6th Cir. 2000) (restating the *Davis* test); *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009).

As to the third prong, "a plaintiff may demonstrate defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648). In *Vance*, a sexual harassment case, the Sixth Circuit explained:

> The [defendant] is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "the [defendant] must merely respond to known peer harassment in a manner that is not clearly unreasonable." The deliberate indifference standard "does not mean that [defendants] . . . must engage in particular disciplinary action." . . . Victims do not have a right to particular remedial demands. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.

*Id.* at 260 (quoting *Davis*, 526 U.S. at 648-49). In the context of a 42 U.S.C. § 1983 claim, the Supreme Court has said that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 411 (1997), *cited in Gebser*, 524 U.S. at 291. "In an appropriate case, there is no reason why courts, on a motion for . . . summary judgment, . . .

15

could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 648; *see also Vance*, 231 F.3d at 260.

### C.     Analysis of TSU's Conduct

Even viewing the evidence in the light most favorable to the plaintiff, the court finds that he cannot show that TSU acted with deliberate indifference to student-on-student racial harassment. Because Maislin cannot meet the second and third prongs of the deliberate indifference test, the court will assume *arguendo* that the first prong is met and that Baxley's behavior created a severe, pervasive, and objectively offensive racial environment.

####     1.     Pre-incident conduct

Maislin argues that leading up to the attack on April 25, Holt, the director of TSU's honors program, ignored his complaints about Baxley's racial harassment. (Pl.'s Opp., Docket No. 51, at 9.) But the plaintiff met with Holt only once to discuss his problems with Baxley, and the only mention of race was that Baxley generally used the word "nigger" too often. Maislin's testimony shows that the meeting focused on Baxley's broad behavioral changes:

> I talked to [Holt] once. Because [Baxley's] mood – his mood shifted from, you know, gentle and quiet to aggressive and playing loud music at times, using derogatory words towards other people. . . . At first, like we were talking about how he was talking to his girlfriend at the time, calling her a chicken head. . . . And then how he was using the N word a lot. And, you know, just talking – losing his temper more and more.

(Dep. of Sean Maislin, Docket No. 44, Ex. 1, at 30-31.) This testimony does not even make it clear that Baxley was directing epithets toward the plaintiff. Maislin did, however, mention that Baxley had become more aggressive and angry toward certain African-American students,

16

including Baxley's girlfriend. (Docket No. 44, Ex. 2, at 77.) At his deposition, Maislin agreed that Baxley "was just being a jerk." (*Id.*)

Given that Baxley was rude to everyone, regardless of race, and was using a slur not typically reserved for white students, it is not surprising that Holt did not divine Baxley's racial animosity toward the plaintiff. Maislin presents no evidence that he told Holt that Baxley was angry that a white student had more friends, that Baxley had called him "cracker," or that he felt racially harassed by Baxley. (*See* Docket No. 44, Ex. 1, at 30-31; Docket No. 44, Ex. 2, at 78, *cited in* Docket No. 51 at 7.)

Nor is there evidence that the plaintiff's father told Holt about any racial aspect of the tension between the roommates. Brian Maislin spoke with Holt on three occasions, but each conversation focused on his general concerns about Baxley's aggressive behavior and his fear that the two men might ultimately get into a fistfight. (*See, e.g.*, Dep. of Brian Maislin, Docket No. 44, Ex. 7, at 65 (testifying that he told Holt about Baxley's "bizarre" and "aggressive" behavior).) Nothing indicates that his conversations with Holt even mentioned the topic of race. (*See id.* at 63-75; Dep. of Brian Maislin, Docket No. 44, Ex. 8, at 76-83, *cited in* Docket No. 51 at 7.)

Maislin argues that Holt should have known about the racially hostile atmosphere because Baxley, along with two other students, complained to her about Maislin's own use of the word "nigger" and his statement that he knew more about being black than Baxley did. (Docket No. 51 at 7.) First, the plaintiff cannot complain that TSU failed to act regarding his own racial harassment and use of racial slurs. Second, and more important, Holt's meetings with Baxley

17

show that she attempted to address the situation. Holt told Baxley to "be mindful" of his own use of the word, "because other people may think that it's okay for them to use it." (Docket No. 44, Ex. 9, at 45.)

In sum, the only race-related problem with Baxley brought to Holt's attention was his use of the word "nigger," and she explicitly told him to reconsider his use of the word. *Cf. Watson v. Jones County Sch. Dist.*, No. 2:07cv100-KS-MTP, 2008 U.S. Dist. LEXIS 69008, at *36-37 (S.D. Miss. Sept. 11, 2008) (dismissing claim partly because middle school principal had taken steps to eliminate the racially hostile environment by instructing students that use of racial slurs was inappropriate). Holt was aware that Baxley and Maislin were not getting along, but she did not have knowledge of severe and pervasive racial harassment against the plaintiff. Furthermore, it is telling that neither Maislin nor his father ever requested a roommate transfer or raised the possibility of switching roommates.[13] Given the knowledge that Holt had, her actions leading up to the April 25 incident were not "clearly unreasonable."

Case law from other courts supports this conclusion. When courts have allowed deliberate indifference claims to go forward, the defendants have been aware of more severe, explicit racial conduct than is present here. For example, in *Cleveland*, high school officials were aware of racial graffiti, slurs, fights and other incidents of racial violence, and a "hit list" threat that the Sheriff's Department discovered, in which a student planned to pull a fire alarm

---

[13] The plaintiff points out that his father mentioned to Holt on April 25 that the plaintiff was spending nights at his parents' house, instead of at the dorm. (Docket No. 51 at 9-10.) But the attack took place just hours after that conversation, and it was not clearly unreasonable for Holt to fail to act in that time frame.

18

and kill African-American students as they exited.  2008 U.S. Dist. LEXIS 6011, at *3-4, 29-30.

In *Bryant*, the defendant high school "allowed the presence of offensive racial slurs, epithets,

swastikas, and the letters 'KKK' inscribed in school furniture and in notes placed in African

American students' lockers and notebooks."  334 F.3d at 931.  Students also wore confederate

flag shirts and put "hangman nooses on their person and their vehicles."  *Id.* at 933.  In another

case the plaintiff, over the course of three years, reported "threats of physical violence, including

lynching; the use of racial epithets; vandalism of Plaintiff's property; and actual physical attacks

on Plaintiff."  *Zeno v. Pine Plains Cent. Sch. Dist.*, No. 07 Civ. 6508 (PED), 2009 U.S. Dist.

LEXIS 42848, at *2 (S.D.N.Y. May 19, 2009).  In contrast, a defendant did not have sufficient

notice of harassment when the plaintiff had mentioned a professor's discussion of the sexual

differences between white and black men and had asked for a transfer.  *Folkes v. N.Y. College of*

*Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 285, 293-94 (E.D.N.Y. 2002).  The

facts in the instant case – that Maislin told Holt that Baxley was using a racial slur not typically

used for white students, without making it clear that the slur was directed toward him – do not

support a finding of notice of pervasive, severe harassment.

### 2.    Post-incident conduct

Maislin argues that aspects of TSU's response to the attack provide further evidence of

the school's deliberate indifference.  (Docket No. 51 at 11-16.)  Broadly, the plaintiff complains

of two things: (1) that TSU did not sufficiently bar Baxley from campus, and (2) that two TSU

officials made discriminatory comments.

But the key inquiry is whether TSU's response to the attack was clearly unreasonable,

19

not whether the plaintiff would have preferred a stricter response. TSU arrested Baxley and presumably cooperated with the state's prosecution of Baxley for the crime of aggravated assault. As soon as Baxley made bail, he met with the Dean of Students, who forced him to move out of the dorm. The Dean also told Baxley that she would recommend his suspension. Maislin does not controvert the Dean's testimony that, "as soon as she read the TSU police report" regarding the attack, "she determined that Baxley must leave the university." (*Id.* at 12.) Baxley in fact received the impression that he was suspended, and after taking his final exams, he transferred to the University of Memphis. The plaintiff saw Baxley on campus exactly one time after the attack, without incident, and he never saw Baxley during his sophomore year. Maislin was never racially harassed by any other student. These undisputed facts show that TSU fulfilled its Title VI obligations in responding to the attack. "[C]ourts should refrain from second guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.

The plaintiff claims that the "utter failure on Defendant's part to take any steps to impose restrictions on Baxley's ability to return to campus" caused his academic decline during his sophomore year. (Docket No. 51 at 16.) He points to four instances where people saw Baxley on campus. (*Id.* at 13-14.) But the legal standard is not that TSU was required to lock down campus to allay the plaintiff's concern that he might, at some time in the future, see Baxley in passing. TSU forced Baxley to move out of the dorm and suspended him. Even though TSU did not hold an official disciplinary hearing until April 2008, it made the impending suspension clear

20

enough to Baxley that he chose to transfer.[14]  In arguing that TSU should have gone further, Maislin is making "particular remedial demands," *Vance*, 231 F.3d at 260, to which he is not entitled.

A case from the Southern District of New York is informative.  In *DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 491 (S.D.N.Y. 2008), the defendant high school investigated an incident of racial harassment, but took no further disciplinary action because it found that the harassing students did not actually use racial slurs.  The question was "not whether the School responded at all, but the adequacy of its response," and the court was required "to give deference to the School's disciplinary judgment."  *Id.* at 496.  "Given the undisputed facts that defendants engaged in some forms of investigation into the [incident], . . . and the fact that [plaintiff] was never again subjected to harassment by [the students]," the school's response was not clearly unreasonable, "even though plaintiffs may have been dissatisfied with the outcome."  *Id.* at 497. Surely, then, TSU's actions in disciplining Baxley were not clearly unreasonable.

Maislin further points to certain racially charged comments by TSU officials as evidence of discrimination.  (Docket No. 51 at 15.)  Holt allegedly told his father that the attack might have been a good thing, because it showed the plaintiff what it is like to be a minority.  Hampton

_____

[14] The plaintiff makes much of the fact that the school delayed the disciplinary hearing until a year after the incident (*see* Docket No. 51 at 14), but after the Spring 2007 semester, Baxley was at a different school in a different city.  Earnest testified that a hearing was not held in September 2007 because Baxley was no longer enrolled.  (Docket No. 44, Ex. 11, at 50.)  The plaintiff argues that the April 2008 hearing took place only because he filed the instant lawsuit. (Docket No. 51 at 14.)  Regardless of why the hearing was ultimately held, the delay was not clearly unreasonable, given that Baxley was no longer enrolled and did not plan to re-enroll. Indeed, it would not have been clearly unreasonable for TSU to postpone the hearing indefinitely under those circumstances.

suggested that the plaintiff could solve his fears about campus security by going to a different school, which Brian Maislin took as a racially hostile comment. If the plaintiff's version of these conversations is true, such comments are inexcusable, especially since the school was reacting to an attack that might have been racially motivated. But neither comment, even if true, bears on the notice that Holt had before the incident or the reasonableness of the school's decision to force Baxley out of the dorm and suspend him, so they cannot save Maislin's claim. *Cf. Paasewe v. Ohio Arts Council*, 74 Fed. Appx. 505, 507 (6th Cir. 2003) ("Offensive or insensitive stray statements are not enough to demonstrate direct evidence of intentional discriminatory motive.")

The attack that the plaintiff suffered was unfortunate. But the defendant did not have notice of severe and pervasive racial harassment before the incident, and its response to the attack was not clearly unreasonable. Accordingly, the plaintiff cannot sustain his Title VI claim.

## CONCLUSION

For all the reasons discussed above, the Motion for Summary Judgment filed by defendant Tennessee State University will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

22